IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-344

 No. COA20-520

 Filed 20 July 2021

 Durham County, No. 20 SPC 202

 IN THE MATTER OF: C.G.

 Appeal by Respondent from an Order entered 7 February 2020 by Judge

 Doretta Walker in Durham County District Court. Heard in the Court of Appeals 10

 March 2021.

 Attorney General Joshua H. Stein, by Assistant Attorney General Erin E.
 McKee, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katy
 Dickinson-Schultz, for respondent-appellant.

 HAMPSON, Judge.

 Factual and Procedural Background

¶1 Respondent-Appellant C.G. (Respondent) appeals from an Involuntary

 Commitment Order entered in Durham County District Court declaring Respondent

 mentally ill, a danger to self and others, and ordering Respondent be committed to

 an inpatient facility for thirty days. The Record reflects the following:
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

¶2 On 30 January 2020, Dr. Phillip Jones, with the Duke University Medical

 Center (Duke), signed an Affidavit and Petition for Involuntary Commitment stating

 Respondent: “presents [as] psychotic and disorganized . . . [Respondent’s] ACTT team

 being unable to stabilize his psychosis in the outpatient treatment. He is so psychotic

 he is unable to effectively communicate his symptoms and appears to have been

 neglecting his own care.” Dr. Jones also stated: “Per [Respondent’s] ACTT he threw

 away his medications and has not been taking them. He needs hospitalization for

 safety and stabilization.” This affidavit was filed on 31 January 2020 in the Durham

 County District Court and Dr. Jones submitted a First Examination for Involuntary

 Commitment report with the Affidavit. The report lists the exact same findings

 supporting commitment as the Affidavit. On 31 January, a Durham County

 magistrate issued a Findings and Custody Order finding Respondent was mentally

 ill and a danger to self or others. Respondent was subsequently delivered to Duke’s

 24-hour facility.

¶3 That same day, Dr. Miles Christensen, also with Duke, signed a 24-Hour

 Facility Exam for Involuntary Commitment report; the report was filed on 3 February

 2020. In this report, Dr. Christensen concluded Respondent was mentally ill and a

 danger to self and others. In the description of findings supporting commitment, Dr.

 Christensen noted, when asked about his goals for hospitalization, Respondent

 replied: “I don’t know, 30, 40, 50 pounds probably.” Dr. Christensen stated
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 Respondent said he would like to gain weight while he was in the hospital. Dr.

 Christensen further noted: “Patient perseverates on being ‘Blessed and highly

 favored’ . . . Talks to other people in the room during interview . . . States ‘gods people

 putting voices in my head’ ” and “[s]uddenly begins crying without any precipitant.”

¶4 On 7 February 2020, the trial court heard Respondent’s case pursuant to N.C.

 Gen. Stat. § 122C-268. At the outset, Respondent’s counsel objected to the

 proceedings because there was no representative for the State present. Respondent’s

 counsel stated, “the judge, on its own initiate---or volition, cannot conduct the

 business of the State and these proceedings to move forward.” The trial court

 responded:

 Because it sounds like the DA’s office is refusing to do anything,
 and then it sounds like the Attorney General’s office is refusing
 to do anything, and Duke and the VA are private and/or federal
 entities; therefore, they can’t. So you’re suggesting we do nothing
 and not have these cases at all as a result of people failing to do
 their duty? . . . I’m not gonna do that.

¶5 Respondent’s counsel continued:

 Additionally, beyond that issue, I would argue that, in this case,
 the paperwork was also improper . . . based on 122C-281 and 285,
 in that while there is an allegation that [Respondent] is an
 individual with a mental illness and dangerous to himself, the
 description of findings in both the first examination and the
 examination done by the 24-hour facility does not allege facts
 that would be sufficient pursuant to the statute to--to meet those
 criteria and what is contained therein is more conclusory, and
 according to In Re: Reid and In Re: Ingram [phonetic spellings],
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 the Court of Appeals has held that conclusory statements are not
 sufficient in the description of findings to proceed in that.

 The trial court stated: “Okay. That’s gonna be denied.”

¶6 The hearing continued and the trial court asked if any witnesses were present

 in this case. The trial court called Dr. Max Schiff, also with Duke, to the witness

 stand. Respondent’s counsel objected as Dr. Schiff was not the doctor who completed

 or signed either of the evaluation or reports in this case. The trial court overruled

 the objection and noted, “if [Dr. Schiff] doesn’t know anything about this case, you

 can keep making your objection and we will go from there.”

¶7 The trial court stated to Dr. Schiff: “you or someone in your organization has

 indicated that [Respondent] has a mental illness and is a danger to himself and

 others, and I will leave you to tell me whether or not you can give me enough evidence

 on this to go forward.” Dr. Schiff responded: “So, yes. [Respondent] has a long-

 standing history of mental illness with psychosis. He currently carries a diagnosis of

 schizoaffective disorder, for which he’s been treated since his late teens.” Dr. Schiff

 continued to explain Respondent had been brought to Duke by “his ACT team”

 because of “an acute change in his mental status with increasing disorganization,

 hallucinations, delusions, abnormal psychomotor behavior, wandering around the

 streets” and because “he had not been taking his medications and had thrown them

 away[.]”
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

¶8 Dr. Schiff also stated: “On my evaluation . . . [Respondent] continued to

 demonstrate very profound disorganization of thought and behavior responding to

 hallucinations or internal stimuli”; that it was “very difficult to elucidate a narrative

 from [Respondent]”; and that Respondent was “reporting that thoughts were being

 inserted into his head and occasionally controlling him, as well as containing

 derogatory content that was quite disturbing to him.” The trial court interjected: “I’m

 sorry. Say -- I didn’t quite get the last thing you said. You said some kind of behavior

 and then you said disturbing?” Dr. Schiff clarified that Respondent heard voices in

 his head and that some of the content was derogatory and disturbing to Respondent.

 Dr. Schiff testified Respondent was compliant with treatment while at Duke but that

 “[Respondent] has stated he does not feel that he really needs the medication, nor

 does he have a long-standing issue.” Dr. Schiff continued: “Although he is accepting

 of help and has improved,” Dr. Schiff was “still concerned that, if he were to be

 discharged, that there would be an immediate decompensation, given his . . .

 hallucinations which are disturbing and to him and, in the past, have led him to have

 aggressive behaviors in the community.”

¶9 After questioning by the trial court, Respondent’s counsel questioned Dr.

 Schiff. When Respondent’s counsel asserted Dr. Schiff was not the doctor who

 completed Respondent’s first examination, Dr. Schiff responded that he was not but

 that he was present for the second examination and was Respondent’s attending
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 physician since the second examination. Respondent’s counsel asked Dr. Schiff if

 Respondent had an “ACT team” that was able to assist Respondent when he was not

 in the hospital. Dr. Schiff replied: “That’s right . . . but they felt that . . . they could

 no longer support him in the community based on his level of disorganization and

 decompensation[.]” Dr. Schiff testified that he was not aware of any prior suicide

 attempts by Respondent, but that Respondent had exhibited “aggressive behavior”

 and been subject to assaults in the past. Dr. Schiff further testified Respondent had

 improved and was taking his medication while at Duke, but Dr. Schiff was concerned

 Respondent would decompensate if discharged especially because Respondent’s ACT

 team—who would normally encourage Respondent to take his medication—felt it

 could not support Respondent in the community.

¶ 10 After Dr. Schiff testified, Respondent took the stand. Counsel asked

 Respondent with whom Respondent lived. Respondent replied: “My brother and my

 friend. My -- he’s my brother first, but he’s my friend second. . . . And his best friend,

 which is my roommate, which is my brother.” Respondent also testified that he had

 previously “gotten into it” with a man named William on the street when William

 became angry. Respondent stated he thought William had an anger management

 problem. However, Respondent said he had never thought of harming William.

 Respondent stated he had been taking his medication and would continue to do so if

 discharged, but that he could not “tell the difference” when asked if he thought the
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 medication was helping him. Respondent also stated that his ACT team and

 Easterseals could provide him assistance if discharged, but that his ACT team

 wanted him to “take care of [his] teeth more,” and Respondent “just disregarded it.”

 Respondent also testified he did not eat “three meals a day,” but that “they have

 started to give me at least breakfast” and he was “gonna have to eat more.” When

 counsel asked Respondent if he would like to be released from Duke, he replied: “I see

 her ankles and Amy -- the Amy at Williams Ward -- Williams Ward remind me of my

 mom’s ankles, and she takes her water pills in the morning. I remind her.” Counsel

 then asked if Respondent was okay.

¶ 11 After questioning by Respondent’s counsel, the trial court asked Respondent:

 “Your ACT team, tell me about what they do to help you.” Respondent testified he

 would see his ACT team on Monday, Wednesday, and Thursday and that Fridays

 were for group substance abuse meetings. Respondent stated he went to group

 sessions “once in a blue” and that he received a bus ticket every time he went. He

 also stated Easterseals gave him weekly checks that he used to buy groceries. The

 trial court asked: “So right before they took you to the hospital, what was going on?”

 Respondent said, “I don’t . . . everything was the same, you know?” When the trial

 court asked “[s]o you don’t know why they took you there?” Respondent replied, “No,

 not really. I’m just there to eat and drink.” The trial court asked Respondent about

 the hallucinations Dr. Schiff said Respondent had experienced; Respondent replied:
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 “I see angels, white dots.” The trial court asked: “You see angels?” Respondent

 explained he saw white dots and black dots floating in the air. The trial court asked

 how the angels made Respondent feel. Respondent replied he knew the white dots

 were angels and that the black dots might be hallucinations or “negativity.”

¶ 12 The trial court asked Respondent if he felt better when he was in the hospital

 or when he was not. Respondent replied that he had “bad habits.” The trial court

 asked Respondent to tell the trial court about his bad habits. Respondent stated he

 smoked cigarettes and marijuana. Respondent continued:

 I pick up Black & Mild filters that’s wooden. . . . I clean up
 cigarette butts. I have picked up a piece of glass . . . in our
 apartment that was right there in the corner near our trash can,
 but I didn’t vacuum the floor over there in that area. I try.

 The trial court asked: “You try?” Respondent replied: “Yes.”

¶ 13 After Respondent’s counsel gave closing arguments, the trial court found “by

 clear, cogent, and convincing evidence that the Defendant, in fact, has a mental issue

 of illness that is schizoaffective disorder and has a long-standing history of mental

 illness since his late teens.” The trial court further found Respondent: suffered from

 hallucinations and disorganized thoughts; was “noncompliant with his medication

 when” not in the hospital; and was a danger to himself and others due to his active

 psychosis. The trial court continued: “[Respondent’s] ACT team initially had him

 committed, as they are unable to see to his needs” and that “[Respondent] was unable
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 to sufficiently care for his needs, that being dental and his nourishment needs.”

 Moreover, the trial court found, “[Respondent] has, in fact become a victim of

 assaultive behavior and disturbing thoughts, which caused deterioration and leaves

 him unable to perceive dangers to himself[.]” Accordingly, the trial court ordered

 Respondent be committed for an additional thirty days. Respondent’s counsel gave

 oral Notice of Appeal in open court.

¶ 14 That same day, the trial court entered its written Order. The trial court

 checked a box incorporating the examination reports signed by Dr. Jones and Dr.

 Christensen as Findings of Fact supported by clear, cogent, and convincing evidence.

 The trial court found by clear, cogent, and convincing evidence the following

 additional Findings of Fact: Respondent had long-standing mental illness dating back

 to his teens; Respondent suffered from hallucinations; Respondent did not take his

 medication when he was not hospitalized; Respondent’s psychosis caused him to be a

 danger to himself; Respondent’s ACT team was “unable to sufficiently take care” of

 Respondent’s dental and nourishment needs; and Respondent had been the victim of

 assaults and disturbing thoughts “which cause deterioration and leaves [Respondent]

 unable to perceive dangers to himself[.]” Accordingly, the trial court concluded

 Respondent was mentally ill and was dangerous to himself and to others.

 Consequently, the trial court ordered Respondent committed for thirty days.

 Issues
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

¶ 15 The issues on appeal are: (I) whether this Court should exercise its discretion

 and allow Respondent’s appeal when Respondent’s counsel did not file a written

 notice of appeal as required by our Rules of Appellate Procedure; (II) whether the

 trial court violated Respondent’s due process right to an impartial tribunal by calling

 and examining a witness in order to elicit evidence, in the absence of any

 representative of the State; and (III) whether the trial court erred in incorporating

 examination reports as Findings of Fact when the reports were not formally admitted

 into evidence and trial, and whether, absent those reports, the trial court’s underlying

 Findings of Fact were supported by competent evidence and, in turn, supported its

 ultimate Findings Respondent was dangerous to himself and to others.

 Analysis

 I. Jurisdiction

¶ 16 Recognizing Respondent’s trial counsel never filed a written Notice of Appeal,

 Respondent’s appellate counsel has filed, concurrently with Respondent’s brief, a

 Petition for Writ of Certiorari with this Court to allow review of the trial court’s

 Order.

¶ 17 Respondents in involuntary commitment actions have a statutory right to

 appeal a trial court’s order. N.C. Gen. Stat. § 122C-272 (2019) (“Judgment of the

 district court [in involuntary commitment cases] is final. Appeal may be had to the

 Court of Appeals by the State or by any party on the record as in civil cases.”). Rule
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 3 of our Rules of Appellate Procedure governs such appeals. N.C.R. App. P. 3(a)

 (2021) (“Any party entitled to appeal from a judgment or order of a superior or district

 court rendered in a civil action or special proceeding may take appeal by filing notice

 of appeal with the clerk of superior court[.]”). Rule 3 requires parties to file written

 notice of appeal thirty days after the entry of such a judgment or order. N.C.R. App.

 P. 3(a), (c) (2021). “Rule 3 is a jurisdictional rule” and “a party’s compliance with Rule

 3 is necessary to establish appellate jurisdiction[.]” Am. Mech., Inc. v. Bostic, 245

 N.C. App. 133, 143, 782 S.E.2d 344, 350 (2016). “[A] jurisdictional rule violation . . .

 precludes the appellate court from acting in any manner other than to dismiss the

 appeal.” Id. at 142, 782 S.E.2d at 350 (citation and quotation marks omitted). Thus,

 in the absence of a properly filed notice of appeal, this Court has no jurisdiction to

 consider Respondent’s appeal as of right.

¶ 18 However, Rule 21 of our Rules of Appellate Procedure provides: “[t]he writ of

 certiorari may be issued in appropriate circumstances by either appellate court to

 permit review of the judgments and orders of trial tribunals when the right to

 prosecute an appeal has been lost by failure to take timely action[.]” N.C.R. App. P.

 21(a)(1) (2021); see also N.C. Gen. Stat. § 7A-32(c) (2019). Respondent concedes his

 counsel did not file written notice of appeal, but, because counsel objected to the

 proceedings and gave oral Notice of Appeal in open court, asks this Court to exercise

 its discretion and issue a writ of certiorari to review his case. Because Respondent’s
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 counsel objected to the proceedings and demonstrated at least the intent to appeal

 the trial court’s order, and because involuntary commitment is a significant incursion

 to one’s liberty interests, Humphrey v. Cady, 405 U.S. 504, 509, 31 L. Ed. 2d 394

 (1972), we grant Respondent’s Petition and review the trial court’s Order.

¶ 19 Additionally, although neither party argues this case is moot because the

 period of commitment has expired, discharge from involuntary commitment does not

 render an appeal moot. “The possibility that respondent’s commitment in this case

 might likewise form the basis for a future commitment, along with other obvious

 collateral legal consequences, convinces us that this appeal is not moot.” In re Moore,

 234 N.C. App. 37, 41, 758 S.E.2d 33, 36 (2014) (citation and quotation marks omitted).

 Accordingly, Respondent’s appeal is properly before this Court.

 II. Impartial Tribunal

¶ 20 Respondent argues the trial court violated his due process right to an impartial

 tribunal because the State was not represented by counsel and the trial court elicited

 evidence in favor of committing Respondent. The due process right to an impartial

 tribunal raises questions of constitutional law that we review de novo. Dorsey v.

 UNC-Wilmington, 122 N.C. App. 58, 66, 468 S.E.2d 557, 562 (1996). “In order to

 preserve an issue for appellate review, a party must have presented to the trial court

 a timely request, objection, or motion, stating the specific grounds for the ruling the

 party desired the court to make if the specific grounds were not apparent from the
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 context.” N.C.R. App. P. Rule 10(a)(1) (2021). Although Respondent’s counsel did not

 expressly state an objection on constitutional grounds, it is apparent from the context

 Respondent objected on due process grounds as counsel objected to the nature of the

 proceedings where there was no counsel for the State present and where the trial

 court was the only entity to elicit evidence on direct examination.

¶ 21 N.C. Gen. Stat. § 122C-268 provides for how both a respondent and the State

 are to be represented in an involuntary commitment proceeding. N.C. Gen. Stat. §

 122C-268(d) mandates a “respondent shall be represented by counsel of his choice; or

 if he is indigent within the meaning of G.S. 7A-450 or refuses to retain counsel if

 financially able to do so, he shall be represented by counsel appointed in accordance

 with rules adopted by the Office of Indigent Defense Services.” N.C. Gen. Stat. §

 122C-268(d) (2019). As to representation of the State’s interests, the statute has

 separate provisions depending on whether the proceeding arises out of a state facility

 or not:

 The attorney, who is a member of the staff of the Attorney
 General assigned to one of the State’s facilities for the mentally
 ill or the psychiatric service of the University of North Carolina
 Hospitals at Chapel Hill, shall represent the State’s interest at
 commitment hearings, rehearings, and supplemental hearings
 held for respondents admitted pursuant to this Part or G.S. 15A-
 1321 at the facility to which he is assigned.

 In addition, the Attorney General may, in his discretion,
 designate an attorney who is a member of his staff to represent
 the State’s interest at any commitment hearing, rehearing, or
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 supplemental hearing held in a place other than at one of the
 State’s facilities for the mentally ill or the psychiatric service of
 the University of North Carolina Hospitals at Chapel Hill.

 N.C. Gen. Stat. § 122C-268(b) (2019).1

¶ 22 The State takes the position that the latter provision means the Attorney

 General has complete discretion whether or not to appear in involuntary commitment

 proceedings at non-state-owned facilities and, thus, involuntary commitment

 proceedings at private hospitals may proceed without the State’s interests being

 represented, as occurred in this case. We express no opinion on the correctness of the

 State’s statutory interpretation or as to the soundness of such practice. However, our

 Court has previously rejected arguments respondent’s due process rights were

 violated in involuntary commitment proceedings where the State, as petitioner, was

 not represented by counsel and where:

 [t]he gravamen of [respondent’s] contention is (1) that he was
 denied a fair hearing because, due to absence of counsel for
 petitioner, the court acted as petitioner’s de facto counsel; and (2)
 that he was denied equal protection of the law because petitioners
 in hearings at state regional psychiatric facilities are represented
 by counsel, G.S. 122-58.7(b), -58.24, while petitioners in hearings
 held elsewhere are not.

 1 In addition: “If the respondent’s custody order indicates that he was charged with a

 violent crime, including a crime involving an assault with a deadly weapon, and that he was
 found incapable of proceeding, the clerk shall give notice of the time and place of the hearing
 as provided in G.S. 122C-264(d). The district attorney in the county in which the respondent
 was found incapable of proceeding may represent the State’s interest at the hearing.” N.C.
 Gen. Stat. § 122C-268(c) (2019).
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 In re Perkins, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983). There, this Court

 noted: “We are aware of no per se constitutional right to opposing counsel. Nothing

 in the record indicates language or conduct by the court which conceivably could be

 construed as advocacy in relation to petitioner or as adversative in relation to

 respondent.” Id. We reached the same conclusion in a companion case filed the same

 day as Perkins, rejecting the argument “it is unconstitutional to allow the trial judge

 to preside at an involuntary commitment hearing and also question witnesses at the

 same proceeding.” In re Jackson, 60 N.C. App. 581, 584, 299 S.E.2d 677, 679 (1983).

 Therefore, because our Court has previously upheld involuntary commitments where

 the State has not appeared and where the trial court has questioned witnesses and

 elicited evidence, we are bound by our prior precedent to conclude the same. See In

 re Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) (“Where a panel of the

 Court of Appeals has decided the same issue, albeit in a different case, a subsequent

 panel of the same court is bound by that precedent, unless it has been overturned by

 a higher court.”).

¶ 23 Moreover, “[j]udges do not preside over the courts as moderators, but as

 essential and active factors or agencies in the due and orderly administration of

 justice. It is entirely proper, and sometimes necessary, that they ask questions of a

 witness[.]” State v. Hunt, 297 N.C. 258, 263, 254 S.E.2d 591, 596 (1979) (citation and

 quotation marks omitted). However, trial courts must be careful to avoid prejudice
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 to the parties and may not impeach a witness’s credibility. State v. Howard, 15 N.C.

 App. 148, 150-51, 189 S.E.2d 515, 517 (1972) (citation omitted).2

¶ 24 In this case, as in Perkins, the Record does not evince language or conduct by

 the trial court that could be construed as advocacy for or against either petitioner or

 Respondent. Here, the trial court called Dr. Schiff to testify. The trial court’s only

 questions of Dr. Schiff on direct examination were: “you or someone in your

 organization has indicated that [Respondent] has a mental illness and is a danger to

 himself and others, and I will leave you to tell me whether or not you can give me

 enough evidence on this to go forward[;]” and “I’m sorry. Say -- I didn’t quite get the

 last thing you said. You said some kind of behavior and then you said disturbing?”

¶ 25 The trial court asked Respondent: “Your ACT team, tell me about what they

 do to help you[;]” “So right before they took you to the hospital, what was going on?”;

 2 We note that, although involuntary commitment cases involve significant
 curtailment of individual liberty interests, these proceedings are not adversarial in the
 respect that the State seeks to convict and incarcerate a respondent for allegedly violating
 the criminal code. Rather, these proceedings are inquisitorial as to whether a respondent is
 a danger to self or to others. Cf. Ramirez-Barker v. Barker, 107 N.C. App. 71, 78, 418 S.E.2d
 675, 679 (1992) (“However, there is no burden of proof on either party on the ‘best interest’
 [of a child in child custody cases] question. Although the parties have an obligation to provide
 the court with any pertinent evidence relating to the ‘best interest’ question, the trial court
 has the ultimate responsibility of requiring production of any evidence that may be competent
 and relevant on the issue. The ‘best interest’ question is thus more inquisitorial in nature
 than adversarial. (citation omitted)). As such, even though the trial court—at least initially—
 elicits a petitioner’s evidence, and, thus, facilitates a petitioner’s case at the outset, a trial
 court that maintains objectivity and does not prejudice either party does not advocate for a
 petitioner in an adversarial manner.
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 “[s]o you don’t know why they took you there?”; whether Respondent experienced

 hallucinations and saw angels; whether Respondent felt better when he was in the

 hospital or in the community; and “tell me about [Respondent’s bad habits].” As such,

 the trial court only elicited evidence that would otherwise be overlooked as no counsel

 for the State was present. The trial court did not ask questions meant to prejudice

 either party or impeach any witness. Accordingly, the trial court did not violate

 Respondent’s right to an impartial tribunal.

 III. Findings of Fact

¶ 26 Respondent also argues the trial court violated his confrontation rights by

 incorporating examination reports signed by Dr. Jones and Dr. Christensen in its

 Findings of Fact when the trial court did not admit the reports into evidence and

 where Dr. Jones and Dr. Christensen were not present to testify at the hearing.

 Consequently, according to Respondent, the trial court’s underlying Findings were

 insufficient to support its ultimate Findings Respondent was a danger to himself and

 to others.

 A. Confrontation

¶ 27 “Certified copies of reports and findings of commitment examiners and

 previous and current medical records are admissible in evidence, but the respondent’s

 right to confront and cross-examine witnesses may not be denied.” N.C. Gen. Stat. §

 122C-268(f) (2019). The Record does not indicate the reports were ever formally
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 introduced at the hearing. As such, Respondent claims he never had a chance to

 properly object to their admission or confront the reports or the doctors who signed

 them, and the State argues Respondent waived his confrontation rights because he

 failed to object during the hearing.

¶ 28 Although the trial court never formally admitted the reports into evidence and,

 thus, Respondent did not object to the reports’ admission, the Record reflects

 Respondent’s counsel did object to the reports as insufficient bases for Respondent’s

 initial commitment. Moreover, Respondent’s counsel objected to Dr. Schiff testifying

 because he was not the doctor who completed and signed the examination reports.

 The trial court overruled the objection stating, “if he doesn’t know anything about

 this case, you can keep making your objection and we will go from there.” Because

 Respondent asserted his right to confront Dr. Jones and Dr. Christensen, as the

 doctors who completed and signed the examination reports, Respondent did not waive

 his confrontation rights. See In re J.C.D., 265 N.C. App. 441, 446, 828 S.E.2d 186,

 190 (2019) (“Since respondent did not object to admission of the report, and she did

 not assert her right to have Dr. Ijaz appear to testify, the trial court did not err by

 admitting and considering the report.”). Therefore, the trial court erred by

 incorporating the reports as Findings of Fact in its Order.

¶ 29 However, even absent the reports, Dr. Schiff’s testimony and the trial court’s

 Findings were sufficient to support the trial court’s Order. See In re Benton, 26 N.C.
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 App. 294, 296, 215 S.E.2d 792, 793 (1975) (reversing the trial court’s order where the

 doctor, who signed an affidavit incorporated by the trial court, was not present to

 testify because “[n]o evidence, except for the [improperly admitted] affidavit, was

 adduced to show that the respondent was imminently dangerous to herself or

 others.”). Consequently, here, the trial court’s error was harmless. See State v.

 Ferguson, 145 N.C. App. 302, 307, 549 S.E.2d 889, 893 (2001) (“Evidentiary errors

 are harmless unless a defendant proves that absent the error a different result would

 have been reached at trial.”).

 B. Sufficiency of the Evidence

¶ 30 “To support an inpatient commitment order, the court shall find by clear,

 cogent, and convincing evidence that the respondent is mentally ill and dangerous to

 self, . . . or dangerous to others . . . .” N.C. Gen. Stat. § 122C-268(j) (2019). Our

 General Statutes define dangerous to self and others as:

 a. Dangerous to self.—Within the relevant past, the individual
 has done any of the following:

 1. The individual has acted in such a way as to show all of the
 following:

 I. The individual would be unable, without care, supervision,
 and the continued assistance of others not otherwise available,
 to exercise self-control, judgment, and discretion in the
 conduct of the individual’s daily responsibilities and social
 relations, or to satisfy the individual’s need for nourishment,
 personal or medical care, shelter, or self-protection and safety.
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 II. There is a reasonable probability of the individual’s
 suffering serious physical debilitation within the near future
 unless adequate treatment is given pursuant to this Chapter.
 A showing of behavior that is grossly irrational, of actions that
 the individual is unable to control, of behavior that is grossly
 inappropriate to the situation, or of other evidence of severely
 impaired insight and judgment shall create a prima facie
 inference that the individual is unable to care for himself or
 herself.

 ....

 b. Dangerous to others.—Within the relevant past, the individual
 has inflicted or attempted to inflict or threatened to inflict serious
 bodily harm on another, or has acted in such a way as to create a
 substantial risk of serious bodily harm to another, or has engaged
 in extreme destruction of property; and that there is a reasonable
 probability that this conduct will be repeated. Previous episodes
 of dangerousness to others, when applicable, may be considered
 when determining reasonable probability of future dangerous
 conduct. Clear, cogent, and convincing evidence that an
 individual has committed a homicide in the relevant past is prima
 facie evidence of dangerousness to others.

 N.C. Gen. Stat. § 122C-3(11) (2019).

¶ 31 Thus, the trial court must satisfy two prongs when finding a respondent is a

 danger to self or others on any of the bases above: “A trial court’s involuntary

 commitment of a person cannot be based solely on findings of the individual’s ‘history

 of mental illness or . . . behavior prior to and leading up to the commitment hearing,’

 but must [also] include findings of ‘a reasonable probability’ of some future harm

 absent treatment[.]” In re J.P.S., 264 N.C. App. 58, 62, 823 S.E.2d 917, 921 (2019)

 (citing In re Whatley, 224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012)). “Although
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 the trial court need not say the magic words ‘reasonable probability of future harm,’

 it must draw a nexus between past conduct and future danger.” Id. at 63, 823 S.E.2d

 at 921.

¶ 32 It is the role of the trial court to determine whether the evidence of a

 respondent’s mental illness and danger to self or others rises to the level of clear,

 cogent, and convincing. In re Whatley, 224 N.C. App. at 270-71, 736 S.E.2d at 530

 (citation omitted). “Findings of mental illness and dangerousness to self are ultimate

 findings of fact.” In re B.S., 270 N.C. App. 414, 417, 840 S.E.2d 308, 310 (2020) (citing

 In re Collins, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980)). On appeal, “[t]his

 Court reviews an involuntary commitment order to determine whether the ultimate

 findings of fact are supported by the trial court’s underlying findings of fact and

 whether those underlying findings, in turn, are supported by competent evidence.”

 B.S., 270 N.C. App. at 417, 840 S.E.2d at 310 (citing In re W.R.D., 248 N.C. App. 512,

 515, 790 S.E.2d 344, 347 (2016)). As such, the trial court must also record the facts

 that support its “ultimate findings[.]” Whatley, 224 N.C. App. at 271, 736 S.E.2d at

 530. “If a respondent does not challenge a finding of fact, however, it is presumed to

 be supported by competent evidence and [is] binding on appeal.” Moore, 234 N.C.

 App. at 43, 758 S.E.2d at 37 (citation and quotation marks omitted).

¶ 33 Here, Respondent does not challenge the trial court’s ultimate Finding he was

 mentally ill. Respondent challenges the trial court’s ultimate Findings he was a
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 danger to himself and to others. Because we conclude the trial court properly found

 Respondent was a danger to himself, we do not reach the issue of whether he was a

 danger to others.

¶ 34 As to whether Respondent was a danger to himself, Respondent challenges the

 trial court’s underlying Findings Respondent could not “take care of his nourishment

 and dental needs” because, according to Respondent, these Findings were not

 supported by the testimony. However, the trial court heard testimony from

 Respondent that his ACT team wanted him to take better care of his teeth and that

 Respondent “disregarded” that advice. Respondent also told the trial court he needed

 to eat more, and that his ACT team was able to provide him “at least one meal” at

 breakfast. But, Dr. Schiff testified that Respondent’s ACT team brought Respondent

 to Duke’s attention because the team felt like it could no longer care for Respondent

 in the community. Therefore, there was some competent evidence as to Respondent’s

 inability to care for his own nourishment and dental needs. It is the trial court’s role,

 and not this Court’s role, to determine whether this evidence rises to the level of clear,

 cogent, and convincing. Whatley, 224 N.C. App. at 270-71, 736 S.E.2d at 530. Thus,

 these underlying Findings satisfied the first prong requiring the trial court find

 Respondent was unable to care for himself.

¶ 35 The trial court’s Finding Respondent’s ACT team was unable to “sufficiently”

 care for Respondent’s “dental and nourishment” needs also created the nexus between
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

 Respondent’s mental illness and future harm to himself. Accordingly, the trial court

 satisfied the requirement it find a reasonable probability of future harm absent

 treatment.

¶ 36 Moreover, the trial court heard testimony from Dr. Schiff that, while under Dr.

 Schiff’s care, Respondent experienced hallucinations and stated “thoughts were being

 inserted to his head and occasionally control[ed] him.” Dr. Schiff testified these

 hallucinations and disturbing thoughts had led to Respondent “wandering the

 streets” and being assaulted in the past and that Respondent would decompensate if

 discharged. Respondent confirmed he saw “angels” and “black dots” he thought were

 hallucinations. Dr. Schiff also testified Respondent said he did not need his

 medication and did not think he had a long-standing issue. “A showing of behavior

 that is grossly irrational, of actions that the individual is unable to control, . . . or of

 other evidence of severely impaired insight and judgment shall create a prima facie

 inference that the individual is unable to care for himself or herself.” N.C. Gen. Stat.

 § 122C-3(11)(a)(1)(II) (2019) (emphasis added). Here, the trial court heard evidence

 of actions Respondent was unable to control and of Respondent’s severely impaired

 insight as to his own condition. As such, the evidence supported the prima facie

 inference Respondent could not care for himself. Consequently, the trial court did

 not err in finding Respondent was a danger to himself.

 Conclusion
 IN RE C.G.

 2021-NCCOA-344

 Opinion of the Court

¶ 37 For the foregoing reasons, we affirm the trial court’s Order.

 AFFIRMED.

 Judge DILLON concurs in a separate opinion.

 Judge GRIFFIN dissents in a separate opinion.
 No. COA20 – 520 In re: C.G.

 DILLON, Judge, concurring.

¶ 38 I fully concur in the majority opinion and its reasoning. I write separately to

 expound on two issues.

 I. Due Process Concerns

¶ 39 First, as noted in the majority opinion, the calling/questioning of Dr. Schiff by

 the trial court, where the State’s interest was not represented at the hearing, was not

 a per se constitutional violation. An involuntary commitment hearing is civil in

 nature, the purpose of which is to determine whether an individual is a danger to self

 or others such that (s)he needs to be further evaluated/treated; the matter is not

 criminal in nature. The State typically does not instigate the process. Rather, the

 process is instigated by a concerned private citizen – typically a doctor or a guardian.

 And while the State has the right to have its interests represented at the hearing, the

 State is not required to have representation.

¶ 40 The individual respondent, whose liberty interests are at issue, has

 constitutional rights, such as to counsel, to present evidence, to cross-examine

 witnesses, and to an impartial judge; however, the individual does not have the

 constitutional right to have the State’s interests represented at the hearing. As noted

 in the majority opinion, our Court has so held in the context of involuntary

 commitment hearings, and we are so bound to hold. See, e.g., In re Perkins, 60 N.C.

 App. 592, 594, 299 S.E.2d 675, 677 (1983).
 IN RE: C.G.
 2021-NCCOA-344
 DILLON, J., concurring

¶ 41 It may be that the Attorney General’s Office simply did not have the resources

 or the desire to appear. However, this decision does not divest the trial court from

 the ability to seek the truth concerning a petition, to determine whether a respondent

 is a danger to self or others.

¶ 42 Further, the respondent’s constitutional rights are not violated simply because

 the trial court calls the person (typically the petitioner) who has appeared at the

 hearing and to question that witness, so long as the trial court remains impartial in

 its search for the truth. Indeed, our Rules of Evidence allow for the trial court to call

 witnesses and question them. N.C. Gen. Stat. § 8C-1, Rule 614(b) (2020). Our

 Supreme Court has described this principle, that “the trial judge may interrogate a

 witness for the purpose of developing a relevant fact . . . in order to ensure justice and

 aid [the fact-finder] in their search for a verdict that speaks the truth.” State v.

 Pearce, 296 N.C. 281, 285, 250 S.E.2d 640, 644 (1979). That Court has further held

 that it is not a per se constitutional violation for the trial court to exercise its right to

 call or question witnesses. State v. Quick, 329 N.C. 1, 21-25, 405 S.E.2d 179, 192-93

 (1991). And our Court has held that it is not per se prejudicial for a judge to question

 a witness, even where the answer provides the sole proof of an element which needs

 to be proved. See State v. Lowe, 60 N.C. App. 549, 552, 299 S.E.2d 466, 468 (1983);

 see also State v. Stanfield, 19 N.C. App. 622, 626, 199 S.E.2d 741, 744 (1973).
 IN RE: C.G.
 2021-NCCOA-344
 DILLON, J., concurring

¶ 43 Other state courts held similarly. For instance, the Indiana Court of Appeals

 held that there was no violation of due process when the presiding judge called and

 questioned witnesses during an involuntary commitment hearing where the State

 was unrepresented. In re Commitment of A.W.D., 861 N.E.2d 1260, 1264 (Ind. App.

 2007).

¶ 44 A Florida appellate court has held that the calling and questioning of the

 witness by the judge due to the absence of any attorney representing the State’s

 interest was harmless and that the respondent’s constitutional rights were not

 violated based on the procedure. Jordan v. State, 597 So.2d 352, 353 (Fla. App. 1992).

 However, that same year, that same court – though recognizing Jordan as good law

 – held that the due process rights of another respondent were violated when the trial

 judge called and questioned the petitioning doctor. Jones v. State, 611 So.2d 577, 580-

 81 (Fla. App. 1992). The Jones court so held, though, not because the State was not

 represented at the hearing. Rather, the court so held because the treating doctor did

 not provide testimony sufficient to support the trial court’s subsequent order for

 involuntary placement. Id. at 580. Perhaps the doctor would have provided sufficient

 testimony in that case had the State’s attorney been present to ask more probing

 questions. But a trial court is more limited, from a due process perspective, in its

 questioning, as the judge may not appear to be advocating to reach a particular result.

 II. Evidentiary Concerns
 IN RE: C.G.
 2021-NCCOA-344
 DILLON, J., concurring

¶ 45 Second, I appreciate the dissent’s concern regarding the trial court’s

 incorporation of the reports of doctors who had examined Respondent in the past but

 who did not testify. However, all the evidence which the trial court relied on to make

 its ultimate findings was supported by the testimony of either Dr. Schiff, whom

 Respondent’s counsel was allowed to cross-examine, or of Respondent himself. And,

 as noted by the majority, the trial court stated at the outset that it was concerned

 that any evidence supporting a commitment order needed to come from Dr. Schiff

 based on what he knew and not from the opinions of doctors who had drafted the

 reports based on their prior examinations. Dr. Schiff had conducted the most recent

 evaluation of Respondent and was the current doctor caring for him.
 No. COA20-520 – In re C.G.

 GRIFFIN, Judge, dissenting.

¶ 46 In this case, an individual was deprived of his liberty by an officer of the court

 who, after expressing some reluctance, offered and admitted evidence against that

 individual, called an adverse witness to testify on his adversary’s behalf, and

 examined that witness to elicit the State’s evidence. I therefore cannot conclude that

 Respondent received a full and fair hearing before a neutral officer of the court, as is

 his right under Article I, Section 19, of the North Carolina Constitution and the

 Fourteenth Amendment of the United States Constitution. Additionally, the majority

 holds that, although the trial court erred by incorporating into its findings of fact

 examination reports written by physicians who did not testify at the hearing, the trial

 court’s error was harmless. I would hold that this assignment of error was not

 preserved for appellate review, as Respondent was deprived of the opportunity to

 object to the reports’ admission, making preservation of this argument for appellate

 review impossible under N.C. R. App. P. 10(a)(1).

 I. Analysis

¶ 47 Respondent argues that he was deprived of his right to an impartial tribunal

 because, in the absence of representation for the State, the trial judge impermissibly

 “present[ed] the State’s evidence in support of [the State’s] claim” and called and

 questioned the State’s witness on its behalf. I agree.

¶ 48 The trial court violated Respondent’s right to due process by (1) offering and

 admitting examination reports into evidence without the knowledge of Respondent
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 or his counsel; (2) depriving Respondent of his opportunity to object to the reports it

 offered and admitted; and (3) calling and examining the State’s witness on the State’s

 behalf. Each of these errors are discussed below in turn.

 A. Offering and Admitting the Examination Reports

¶ 49 “A judge’s impartiality . . . implicates both federal and state constitutional due

 process principles.” State v. Oakes, 209 N.C. App. 18, 29, 703 S.E.2d 476, 484 (2011)

 (citing Tumey v. Ohio, 273 U.S. 510, 523 (1927)). The Fourteenth Amendment of the

 United States Constitution provides that no state “shall . . . deprive any person of life,

 liberty, or property, without due process of law.” U.S. Const. amend. XIV, § 1. The

 Law of the Land Clause contained in Article I, Section 19, of the North Carolina

 Constitution “guarantees to the litigant in every kind of judicial proceeding the right

 to an adequate and fair hearing before an impartial tribunal, where he may contest

 the claim set up against him, and . . . meet it on the law and the facts and show if he

 can that it is unfounded.” In re Edwards’ Estate, 234 N.C. 202, 204, 66 S.E.2d 675,

 677 (1951) (citations omitted); see also Rhyne v. K-Mart Corp., 358 N.C. 160, 180, 594

 S.E.2d 1, 15 (2004) (“The term ‘law of the land’ as used in Article I, Section 19, of the

 Constitution of North Carolina, is synonymous with ‘due process of law’ as used in

 the Fourteenth Amendment to the Federal Constitution.” (citation omitted)).

¶ 50 In cases where an individual’s “claim or defense turns upon a factual

 adjudication,” as here, “the constitutional right of the litigant to an adequate and fair
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 hearing requires that he be apprised of all the evidence received by the court and given

 an opportunity to test, explain, or rebut it.” In re Gupton, 238 N.C. 303, 304-05, 77

 S.E.2d 716, 717-18 (1953) (emphasis added) (citations omitted); see also State v.

 Gordon, 225 N.C. 241, 246, 34 S.E.2d 414, 416 (1945) (“‘The basic elements’ of a fair

 and full hearing on the facts ‘include the right of each party to be apprised of all the

 evidence upon which a factual adjudication rests, plus the right to examine, explain

 or rebut all such evidence[.]’” (quoting Carter v. Kubler, 320 U.S. 243, 247 (1943)));

 Biddix v. Rex Mills, Inc., 237 N.C. 660, 663, 75 S.E.2d 777, 780 (1953) (“In a judicial

 proceeding the determinative facts upon which the rights of the parties must be made

 to rest must be found from . . . evidence offered in open court . . . . Recourse may not

 be had to records, files, or data not thus presented to the court for consideration.”).

 Our Supreme Court has previously held that “manifestly there is no hearing in any

 real sense when the litigant does not know what evidence is received and considered

 by the court.” Edwards’ Estate, 234 N.C. at 204, 66 S.E.2d at 677.

¶ 51 In this case, the trial court considered as evidence examination reports written

 by two physicians who did not testify at the hearing. Critically, the trial court never

 offered the reports into evidence in open court, nor did it make any ruling on the

 reports’ admissibility as evidence. Respondent was thus not “apprised of all the

 evidence received by the court and given an opportunity to test, explain, or rebut it[,]”

 in accordance with his constitutional right to a full and fair hearing on the facts.
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 Gupton, 238 N.C. at 304-05, 77 S.E.2d at 717-18. Instead, the trial court unilaterally

 offered the reports as evidence in the State’s stead, admitted them as evidence, and

 proceeded to incorporate the evidence into its findings of fact. All of this occurred

 without the knowledge of Respondent or his counsel. Such a practice cannot comport

 with the bedrock procedural safeguards demanded by our State and federal

 constitutions. It is a basic guarantee of due process that every litigant be informed

 of the evidence considered by the court. In re Gibbons, 245 N.C. 24, 29, 95 S.E.2d 85,

 88 (1956) (“The basic and fundamental law of the land requires that parties litigant

 be given an opportunity to be present in court when evidence is offered in order that

 they may know what evidence has been offered[.]”).

 B. Opportunity to Object

¶ 52 Respondent was also deprived of an opportunity to object to the admission of

 the reports as required to preserve the issue of their admissibility for appellate

 review.

¶ 53 N.C. Gen. Stat. § 122C-268(f) provides that “[c]ertified copies of reports and

 findings of commitment examiners and previous and current medical records are

 admissible in evidence, but the respondent’s right to confront and cross-examine

 witnesses may not be denied.” N.C. Gen. Stat. § 122C-268(f) (2019). It follows that

 an examination report authored by a physician who does not appear to testify at trial

 is normally inadmissible as evidence. In re Hogan, 32 N.C. App. 429, 432-33, 232
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 S.E.2d 492, 494 (1977). However, this Court has held that a respondent must “object

 to admission of the report” or “assert her right to have [the physician who authored

 the report] appear to testify” at trial in order to preserve the issue of the report’s

 admissibility for appellate review under N.C. R. App. P. 10(a)(1). In re J.C.D., 265

 N.C. App. 441, 446, 828 S.E.2d 186, 190 (2019).

¶ 54 As noted by the majority, “the trial court never formally admitted the reports

 into evidence and, thus, Respondent did not object to the reports’ admission.”

 Nonetheless, the majority holds that the issue of the reports’ admissibility as evidence

 was adequately preserved by Respondent, reasoning that Respondent asserted his

 right to confront the two physicians who authored the reports:

 Respondent’s counsel objected to Dr. Schiff testifying
 because he was not the doctor who completed and signed
 the examination reports. The trial court overruled the
 objection stating, “if he doesn’t know anything about this
 case, you can keep making your objection and we will go
 from there.” Because Respondent asserted his right to
 confront Dr. Jones and Dr. Christensen, as the doctors who
 completed and signed the examination reports, Respondent
 did not waive his confrontation rights. See In re J.C.D., 265
 N.C. App. 441, 446, 828 S.E.2d 186, 190 (2019) (“Since
 respondent did not object to admission of the report, and
 she did not assert her right to have Dr. Ijaz appear to
 testify, the trial court did not err by admitting and
 considering the report.”).

¶ 55 The majority does not explain how Respondent managed to assert his right to

 confront Dr. Jones and Dr. Christensen by lodging an objection to the admissibility
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 of Dr. Schiff’s testimony. Considering the context in which the objection was made,

 along with the trial court’s ruling in response, Respondent’s objection was clearly

 based on the grounds that Dr. Schiff lacked the personal knowledge necessary to

 provide admissible testimony. See N.C. Gen. Stat. § 8C-1, Rule 602 (2019) (“A witness

 may not testify to a matter unless evidence is introduced sufficient to support a

 finding that he has personal knowledge of the matter. Evidence to prove personal

 knowledge may, but need not, consist of the testimony of the witness himself.”). The

 trial court made it clear that it understood this to be the grounds for Respondent’s

 objection when it ruled on the objection, stating “if [Dr. Schiff] doesn’t know anything

 about this case, you can keep making your objection and we will go from there.” This

 ruling can hardly be interpreted as a ruling made in response to a party asserting his

 right to confront two witnesses who were not present at the hearing.

¶ 56 The majority also notes that “the Record reflects Respondent’s counsel did

 object to the reports as insufficient bases for Respondent’s initial commitment.” This

 specific objection was directed at whether the reports were sufficient “to establish

 reasonable grounds for the issuance of [the original] custody order” by the magistrate.

 See In re Reed, 39 N.C. App. 227, 229, 249 S.E.2d 864, 866 (1978). Given that this

 objection was made on specific grounds wholly unrelated to the admissibility of the

 reports as evidence at the district court hearing or Respondent’s right to

 confrontation, it cannot extend to preserve the issue at bar for appellate review. See,
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 e.g., Powell v. Omli, 110 N.C. App. 336, 350, 429 S.E.2d 774, 780 (1993) (“A specific

 objection that is overruled is effective only to the extent of the grounds specified.”

 (citation omitted)).

¶ 57 Respondent was deprived of his opportunity to object to the admissibility of the

 reports as evidence. I would therefore hold that his argument regarding the reports’

 admissibility is not preserved for appellate review under N.C. R. App. P. 10(a)(1). As

 discussed above, however, the trial court deprived Respondent of his constitutional

 right to an impartial tribunal by offering the reports into evidence, admitting them

 as evidence, and incorporating them into its findings of fact. The trial court also

 violated Respondent’s right to due process by depriving him of his opportunity to

 object to the admissibility of the reports, and thus depriving him of the opportunity

 to have the question of the reports’ admissibility reviewed on appeal.

 C. Calling and Examining the State’s Witness

¶ 58 The trial court impermissibly assumed the role of Respondent’s adversary by

 calling and examining the State’s witness on the State’s behalf. “A commitment order

 is essentially a judgment by which a person is deprived of his liberty, and as a result,

 he is entitled to the safeguard of a determination by a neutral officer of the court . . .

 just as he would be if he were to be deprived of liberty in a criminal context.” Reed,

 39 N.C. App. at 229, 249 S.E.2d at 866 (citation omitted). This Court has previously

 held that, because a commitment order involves a deprivation of liberty, a trial judge
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 may not “assume[] the role of prosecuting attorney [by] examining the State’s

 witnesses” on its behalf during “juvenile proceedings that could lead to detention.” In

 re Thomas, 45 N.C. App. 525, 526, 263 S.E.2d 355, 355 (1980).

¶ 59 This Court’s decision in Thomas involved a juvenile proceeding in which the

 respondent was represented by counsel but where “[t]he State was not represented

 by the District Attorney or other counsel.” Id. at 526, 263 S.E.2d at 355. In the

 absence of counsel for the State, “the trial judge examined all three witnesses” on the

 State’s behalf. Id. Although the record on appeal did “not reveal that [the trial judge]

 asked leading questions or was otherwise unfair during the course of the hearing[,]”

 this Court held that the respondent’s right to due process was violated because “the

 judge, at least technically, assumed the role of prosecuting attorney in examining the

 State’s witnesses.” Id.

¶ 60 Here, the trial judge similarly called and examined the State’s witness on the

 State’s behalf. The judge did not ask any “leading questions[,]” nor was she

 “otherwise unfair during the course of the hearing.” Id. Nonetheless, as this Court

 reasoned in Thomas, the “dual role of judge and prosecutor” simply cannot “measure

 up to the essentials of due process and fair treatment” in a proceeding where an

 individual’s physical liberty is at stake. Id. at 527, 263 S.E.2d at 356.

¶ 61 Although this Court’s opinion in Thomas involved a civil commitment order in

 the context of juvenile proceedings, “as in both proceedings for juveniles and mentally
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

deficient persons [where] the state undertakes to act in parens patriae, it has the

inescapable duty to vouchsafe due process[.]” In re Watson, 209 N.C. App. 507, 516,

706 S.E.2d 296, 302 (2011) (citations omitted). Moreover, “the Due Process Clause

requires the Government in a civil-commitment proceeding to demonstrate by clear

and convincing evidence that the individual is mentally ill and dangerous.” U.S. v.

Jones, 463 U.S. 354, 362 (1983) (emphasis added) (citing Addington v. Texas, 441 U.S.

418, 426-27 (1979)); Foucha v. Louisiana, 504 U.S. 71, 76 (1992) (“[T]he State is

required by the Due Process Clause to prove by clear and convincing evidence the . . .

statutory preconditions to commitment[.]” (citation omitted)). The trial court thus

cannot relieve the State of its burden of proof by calling the State’s witnesses when

the State fails to prosecute its case.3

 3 The majority contends that involuntary commitment proceedings are not
“adversarial” but are instead “inquisitorial[,]” citing the “best interest” of a child in custody
cases as analogous to the nature of the inquiry in involuntary commitment proceedings.
However, caselaw clearly indicates that involuntary commitment proceedings are not only
adversarial in nature but are necessarily so as a matter of due process. See Vitek v. Jones,
445 U.S. 480, 485, 495-97 (1980) (holding that, because individuals “facing involuntary
[commitment] to a mental hospital are threatened with immediate deprivation of liberty . . .
and because of the inherent risk of a mistaken [commitment], the District Court properly
determined that” involuntary commitment “must be accompanied by adequate notice, an
adversary hearing before an independent decisionmaker, a written statement by the
factfinder of the evidence relied on and the reasons for the decision[,]” and independent
assistance provided to the respondent by the State (emphasis added)); Foucha, 504 U.S. at
81 (holding that Louisiana’s civil commitment statute did not comply with due process
because, pursuant to the statute, the respondent was not “entitled to an adversary hearing
at which the State must prove by clear and convincing evidence that he is demonstrably
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

¶ 62 The majority holds that “because our Court has previously upheld involuntary

 commitments where the State has not appeared and where the trial court has

 questioned witnesses and elicited evidence, we are bound by our prior precedent to

 dangerous to the community”); Demore v. Kim, 538 U.S. 510, 550 (2003) (Souter, J.,
 concurring in part and dissenting in part) (noting that the Court in Foucha “held that
 Louisiana’s civil commitment statute failed due process because the individual was denied
 an ‘adversary hearing at which the State must prove by clear and convincing evidence that
 he is demonstrably dangerous to the community’” (quoting Foucha, 504 U.S. at 81)).

 Moreover, unlike in involuntary commitment proceedings where “the State is required
 by the Due Process Clause to prove by clear and convincing evidence the . . . statutory
 preconditions to commitment[,]” Foucha, 504 U.S. at 75, “there is no burden of proof on either
 party” when determining the “best interest” of a child in custody cases. Ramirez-Barker v.
 Barker, 107 N.C. App. 71, 78, 418 S.E.2d 675, 679 (1992), overruled on other grounds by
 Pulliam v. Smith, 348 N.C. 616, 501 S.E.2d 898 (1998). This distinction is critical; “[i]n cases
 involving individual rights, whether criminal or civil, the standard of proof at a minimum
 reflects the value society places on individual liberty.” Addington, 441 U.S. at 425 (1979).
 “The rule as to the burden of proof is important and indispensable in the administration of
 justice. It constitutes a substantial right of the party upon whose adversary the burden rests,
 and therefore it should be guarded carefully and rigidly enforced by the courts.” Skyland
 Hosiery Co. v. American Ry. Express Co., 184 N.C. 478, 480, 114 S.E. 823, 824 (1922).

 It is clear that the State may only “confine a mentally ill person if it shows ‘by clear
 and convincing evidence that the individual is mentally ill and dangerous[.]’” Foucha, 504
 U.S. at 80. “Here, the State has not carried that burden.” Id. The State’s burden of proof
 does not suddenly vanish when the State fails to prosecute its case. Id. Instead, the burden
 must be assumed by either the trial court or the respondent, or the case must be dismissed.
 The trial court cannot simultaneously bear the incompatible burdens of neutrality and proof
 without depriving litigants of the right to due process. Indeed, the burden of proof is
 inherently adversarial and unneutral. See Skyland Hosiery Co., 184 N.C. at 480, 114 S.E.
 823, 824. The trial court therefore necessarily deprived Respondent of his right to an
 impartial tribunal by prosecuting the State’s case in the State’s absence. See Upchurch v.
 Hudson Funeral Home, Inc., 263 N.C. 560, 567, 140 S.E.2d 17, 22 (1965) (“Every suitor is entitled
 by the law to have his cause considered with the cold neutrality of the impartial judge . . . . This
 right can neither be denied nor abridged.” (citations and internal quotation marks omitted)).
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 conclude the same.” In so holding, the majority relies exclusively on this Court’s

 decisions in In re Perkins, 60 N.C. App. 592, 299 S.E.2d 675 (1983), and In re Jackson,

 60 N.C. App. 581, 299 S.E.2d 677 (1983). Neither Perkins nor Jackson passed on the

 constitutional question we are being asked to decide. Both cases involved

 constitutional challenges to the involuntary commitment statutes. This Court

 disposed of both cases on the same grounds, holding that neither respondent could

 demonstrate standing sufficient to challenge the constitutionality of the statutes. See

 Perkins, 60 N.C. App. at 594, 299 S.E.2d at 677 (holding that the respondent failed

 “to show that he ha[d] been adversely affected by the involuntary commitment

 statutes as applied, and he therefore ha[d] no standing to challenge their

 constitutionality”); Jackson, 60 N.C. App. at 584, 299 S.E.2d at 679 (“A litigant who

 challenges a statute as unconstitutional must have standing. To have standing, he

 must be adversely affected by the statute. We find no prejudice to the respondent in

 the challenged portions of the statute. Thus, she has no standing to challenge their

 constitutionality.” (citations omitted)).

¶ 63 The majority’s reliance on Perkins and Jackson is misplaced for two reasons.

 First, “standing is a necessary prerequisite to a court’s proper exercise of subject

 matter jurisdiction[.]” Willowmere Community Assoc., Inc. v. City of Charlotte, 370

 N.C. 553, 563, 809 S.E.2d 558, 560 (2018) (citations and quotation marks omitted).

 By holding that the respondents in Perkins and Jackson lacked standing to challenge
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 the involuntary commitment statutes, this Court declined to decide the underlying

 constitutional question in both cases. Accordingly, Perkins and Jackson cannot stand

 for the proposition that the trial court’s conduct in this case complied with due process

 requirements.

¶ 64 Second, unlike in Perkins and Jackson, Respondent does not challenge the

 constitutionality of the involuntary commitment statutes as applied to him. He

 alleges that the trial court deprived him of his right to have his case decided by a

 neutral officer of the court when it presented the State’s case in the State’s absence.

 He does not argue that the involuntary commitment statutes unconstitutionally vest

 discretion in the State to either send a representative to pursue its interest in court

 or not. He argues that a trial judge’s absolute duty of impartiality cannot be waived

 without depriving litigants of their right to due process. 4

 4 Because Respondent does not raise a constitutional challenge to the involuntary

 commitment statutes on appeal, neither Perkins nor Jackson assists us in addressing the
 constitutional question raised by Respondent. For the same reason, the standing analyses
 in both cases are inapplicable in this case. Writing for our Supreme Court in Committee to
 Elect Dan Forest v. Employees Political Action Committee, 376 N.C. 558, 2021-NCSC-6,
 Justice Hudson delineated the key distinctions between the standing requirements under our
 State and federal constitutions. Among those distinctions is that, unlike the federal
 constitution, “the federal injury-in-fact requirement has no place in the text or history of our
 [State] Constitution” and is “inconsistent with the caselaw of this Court.” Id. ¶¶ 73-74. “[A]s
 a rule of prudential self-restraint,” however, our caselaw requires “a plaintiff to allege ‘direct
 injury’” before a court can “invoke the judicial power to pass on the constitutionality of a
 legislative or executive act.” Id. ¶ 73.
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 D. Discretion of the Attorney General

¶ 65 The State argues on appeal that N.C. Gen. Stat. § 122C-268(b) “specif[ies] that

 the Attorney General has discretion on whether to send a member of his staff to a

 hearing outside a State facility for the mentally ill.” Respondent does not challenge

 the Attorney General’s statutory authority to choose not to send a representative to

 represent the State in involuntary commitment proceedings involving non-State

 facilities. Respondent alleges that the trial court deprived him of his right to an

 impartial tribunal by presenting the State’s case in the State’s absence.

¶ 66 Nonetheless, in evaluating the adequacy of procedural protections afforded to

 an individual in a government proceeding, the due process inquiry under the federal

 constitution considers “the Government’s interest, including the function involved

 In cases where an individual is not challenging the constitutionality of a statute, as
 here, our caselaw only requires that the individual allege a legal injury in order to establish
 standing: “When a person alleges the infringement of a legal right arising under a cause of
 action at common law, a statute, or the North Carolina Constitution, . . . the legal injury itself
 gives rise to standing.” Id. ¶ 82. (emphasis added). This is because the “remedy clause [of
 our State Constitution] should be understood as guaranteeing standing to sue in our courts
 where a legal right at common law, by statute, or arising under the North Carolina
 Constitution has been infringed.” Id. ¶ 81 (emphasis in original) (citing N.C. Const. Art. I, §
 18, cl. 2).

 Here, Respondent alleges that he has the right pursuant to our State and federal
 constitutions to have his case decided by an impartial tribunal and that he was deprived of
 this right when the trial court prosecuted the State’s case in the State’s absence. Because
 Respondent does not challenge the involuntary commitment statutes as unconstitutional, his
 allegation of a legal injury “itself gives rise to standing.” Id. ¶ 82. Accordingly, none of this
 Court’s reasoning in Perkins or Jackson has any application to the constitutional concerns
 raised in this case.
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 and the fiscal and administrative burdens that the additional or substitute

 procedural requirement would entail.” Matthews v. Eldridge, 424 U.S. 319, 335

 (1976). While this is not a consideration under our State Constitution, “[a] judge’s

 impartiality . . . implicates both federal and state constitutional due process

 principles.” Oakes, 209 N.C. App. at 29, 703 S.E.2d at 484 (citing Tumey, 273 U.S. at

 523). Accordingly, it is helpful to address the State’s argument in order to thoroughly

 examine the due process concerns at issue in this case.

¶ 67 In “striking the appropriate due process balance” under the Fourteenth

 Amendment, “the Government’s interest, and hence that of the public, in conserving

 scarce fiscal and administrative resources is a factor that must be weighed.”

 Matthews, 424 U.S. at 347-48. N.C. Gen. Stat. § 122C-268(b) provides that

 [t]he attorney, who is a member of the staff of the Attorney
 General assigned to one of the State’s facilities for the
 mentally ill or the psychiatric service of the University of
 North Carolina Hospitals at Chapel Hill, shall represent
 the State’s interest at commitment hearings, rehearings,
 and supplemental hearings held for respondents admitted
 pursuant to this Part or G.S. 15A-1321 at the facility to
 which he is assigned.

 In addition, the Attorney General may, in his discretion,
 designate an attorney who is a member of his staff to
 represent the State’s interest at any commitment hearing,
 rehearing, or supplemental hearing held in a place other
 than at one of the State’s facilities for the mentally ill or
 the psychiatric service of the University of North Carolina
 Hospitals at Chapel Hill.
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 N.C. Gen. Stat. § 122C-268(b) (2019). According to the language of the statute, the

 Attorney General has the discretion to choose whether to send a representative to

 pursue the State’s interest in cases where, as here, a respondent has been committed

 to a non-State facility.

¶ 68 It is clear that the statute has given the Attorney General discretion. There is

 no indication, however, that he is so lacking in administrative and financial resources

 that he is unable to send a member of his staff to represent the State’s interest at

 involuntary commitment proceedings. In recent years, the Attorney General has

 devoted immense State resources to national litigation in which North Carolinians

 have much less at stake than their constitutionally protected liberty interests. See,

 e.g., Complaint for Declaratory and Injunctive Relief, California v. Chao, No. 19-CV-

 02826 (D.D.C. Sept. 20, 2019) (joining other states’ attorneys general in suit seeking

 injunctive relief to allow California to set independent standards for vehicle

 emissions); Complaint for Declaratory and Injunctive Relief, New York v. Trump, No.

 20-CV-05770 (S.D.N.Y. July 24, 2020) (joining other states’ attorneys general in suit

 seeking to enjoin the Trump Administration from adding a citizenship questionnaire

 to the 2020 U.S. Census).

¶ 69 I do not question the Attorney General’s judgment in pursuing such claims.

 He has been elected by the citizens of North Carolina to make such decisions.

 Nonetheless, ensuring that North Carolina citizens’ due process rights are observed
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 prior to depriving them of their physical liberty is indisputably of paramount,

 steadfast importance. At a bare minimum, each of our branches of government must

 observe the constitutional rights guaranteed to the citizens of this State. These rights

 are not waivable by the Attorney General, the General Assembly, or this Court. The

 State’s interest in declining to have an individual represent its interest in this case

 must yield to the constitutionally guaranteed right that each individual has in having

 his cause heard by an impartial tribunal prior to being deprived of his physical

 liberty.

¶ 70 Finally, the instant case is one of several cases pending before this Court in

 which the respondents argue that they were deprived of their right to an impartial

 tribunal. In each proceeding, the Attorney General chose not to send a member of his

 Office to represent the State’s interest. It is apparent from the Record in this case

 that no one present at the proceeding, including the trial judge, was provided any

 explanation as to why a representative did not appear for the State. In response to

 Respondent’s objection for lack of representation for the State, the trial judge stated,

 Because it sounds like the DA’s office is refusing to do
 anything, and then it sounds like the Attorney General’s
 office is refusing to do anything, and Duke and the VA are
 private and/or federal entities; therefore they can’t.

 So you’re suggesting we do nothing and not have these
 cases at all as a result of people failing to do their duty?

 ....
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

¶ 71 I’m not gonna do that.

¶ 72 The Attorney General places North Carolina trial judges in an impossible

 situation by choosing to not send a representative to prosecute the State’s case at

 involuntary commitment proceedings. The trial judge can either abandon her

 constitutional duty to remain impartial by prosecuting the State’s case in the State’s

 absence, or she can dismiss the commitment petition for lack of evidence to support

 commitment. The former has the effect of denying parties their constitutional right

 to a full and fair hearing before an impartial tribunal. The latter may prevent an

 individual suffering with mental illness from receiving the medical care he needs.

 This could be at the expense of his safety, or the safety of others. Regardless of which

 choice the trial judge makes, the result is a disservice to the respondents in these

 proceedings and to the citizens of this State.

 II. Conclusion

¶ 73 The process of involuntary commitment necessarily involves “a massive

 curtailment of liberty.” Humphrey v. Cady, 405 U.S. 504, 509 (1972). “Whether the

 individual is mentally ill and dangerous to either himself or others and is in need of

 confined therapy turns on the meaning of the facts which must be interpreted by

 expert psychiatrists and psychologists.” Addington v. Texas, 441 U.S. 418, 429 (1979).

 “The medical nature of the inquiry, however, does not justify dispensing with due
 IN RE C.G.

 2021-NCCOA-344

 GRIFFIN, J., dissenting

 process requirements[,]” as “[i]t is precisely the subtleties and nuances of psychiatric

 diagnoses that justify the requirement of adversary hearings.” Vitek v. Jones, 445

 U.S. 480, 495 (1980) (citation, internal quotation marks, and alteration in original

 omitted).

¶ 74 Each of the errors discussed above would not have occurred were Respondent

 afforded the transparent structure of an adversarial proceeding held in open court

 with all parties present. Each of the foregoing errors, standing alone, were enough

 to deprive Respondent of his constitutional right to an impartial tribunal.